# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CR424-098-5 |
| | ) | |
| ERICK COLLINS, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Defendant Erick Collins is indicted on one count of conspiracy to possess with intent to distribute and to distribute controlled substances (cocaine, cocaine base, fentanyl, methamphetamine, oxycodone, and marijuana), and one count of possession with intent to distribute a controlled substance (fentanyl). *See* doc. 3 at 2-3 (Count One), 18 (Count Sixteen). He has filed a motion to suppress statements he made to law enforcement officers, doc. 223, and a motion to suppress the fruits of a search of a motel room, doc. 224. The Government opposed. Doc. 251. On June 26, 2025, the Court held a hearing on his Motions. *See* doc. 285 (Minute Entry). After that hearing, the Court directed the parties to supplement the Motions and response. *See id.* They complied. *See* doc.

1

307 (Supplemental Motion); doc. 318 (Response).  Collins' Motions are, therefore, ripe for disposition.

The events leading to the instant motions occurred on March 14, 2024.  *See* doc. 223 at 1.  On that date, Collins was in a room at a motel in Statesboro, Georgia.  *Id.* at 1-2.  Lieutenant Jake Saxon testified at the hearing that officers received a tip from another arrestee that Collins was staying at the motel.  There was an active warrant for Collins' arrest and, prior to the events at issue, officers obtained a search warrant for Collins' person.  *See* doc. 285-3 at 5.  Officers, including Saxon and Captain Marcus Neesmith, who also testified at the June 26 hearing, forcibly entered the room where Collins was lying in bed.  Body-worn-camera recordings of the events, which were admitted at the hearing, show that officers used a battering ram to breach the door.

Once the door was breached, the recordings and Defendant Saxon's testimony show that Collins was immediately discovered lying in bed. Saxon instructed Collins to show his hands several times and testified that, when Collins failed to comply, he was tased.  Review of the recordings does not clearly support Saxon's version of events, but whether the use of force was justified is not before the Court.  Once

Collins was subdued, handcuffed, and placed in a chair, he began speaking with Saxon. The details of that conversation, and its consequences, are the focus of the instant Motions. The particular facts are, therefore, discussed below.

### A. Statements (Doc. 223)

Collins moved to suppress statements he made to Saxon during his conversation in the hotel room, as obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), or otherwise involuntarily made, *see Jackson v. Denno*, 378 U.S. 368 (1984). *See generally* doc. 223. That Motion, however, did not specify what statements were made and, therefore, did not clearly argue for their suppression. *Id.* After the hearing the Court directed Collins to submit a supplemental brief specifying the statements he sought to suppress. Doc. 285 at 1. He complied. *See* doc. 307 at 5. Collins' Supplemental Motion concedes that he initiated the conversation with Saxon. *See id.* at 4-5. It argues, however, that there was a lull in the conversation, after which Saxon states: "Let me ask you this. Is there anything here?" Collins' response is somewhat inarticulate, and Saxon repeats his question. Several seconds later, he repeats the question twice more. Finally, Collins states

"Yeah, they just dropped it off," after which the body-worn camera recording abruptly stops. *Id.* at 5. Collins argues that the repeated question "Is there anything here?" amounts to *Miranda* interrogation. *Id.* at 6. As such, the failure to advise Collins of his rights requires suppression of his statement. *Id.* at 5-6. The Government argues that Saxon's repeated questions were not "interrogation," within the meaning of *Miranda*, but "clarifying questions," prompted by Collins' voluntary statements apparently offering to assist them in controlled drug purchases. Doc. 318 at 6. The parties also dispute whether, assuming that the questions were "interrogation," the statements are nevertheless admissible pursuant to the "public safety exception," to *Miranda*. *See* doc. 251 at 7-9; doc. 307 at 7-9; doc. 318 at 7-9.

"The Fifth Amendment provides to every person a right against self-incrimination, U.S. Const. amend. V, and, correspondingly, requires that trial courts exclude from evidence any incriminating statements an individual makes before being warned of his rights to remain silent and to obtain counsel." *United States v. Luna-Encinas*, 603 F.3d 876, 880 (11th Cir. 2010); *see also, e.g., United States v. Woodson*, 30 F.4th 1295, 1303 (11th Cir. 2022). Entitlement to *Miranda* warnings attaches "when

4

custodial interrogation begins." *Luna-Encinas*, 603 F.3d at 880 (quoting *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004)) (quotation marks omitted).

The Supreme Court has explained that "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301 (emphasis added); *see also id.* at 300 (" 'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself."). "A district court need not suppress spontaneous remarks which are not the product of 'interrogation.'" *United States v. Hall*, 716 F.2d 826, 830 (11th Cir. 1983). Defendant bears the burden of showing that his statements were the result of interrogation. *See, e.g., United States v. Peck*, 17 F. Supp. 3d 1345, 1354 (N.D. Ga. 2014) (noting that courts "have assigned the burden of proof to

the defendant seeking to challenge the admissibility of statements in the absence of a formal arrest," and collecting cases); *see also, e.g., United States v. Chaidez-Reyes*, 996 F. Supp. 2d 1321, 1345 n. 23 (N.D. Ga. Feb. 10, 2014) ("[T]he defendant bears the burden of establishing that he was in custody and that his statements were made in response to government questioning."). However, the Government bears the burden of showing whether some exception to *Miranda* applies. *Chaidez-Reyes*, 996 F. Supp. 2d at 1345. Here, there is no dispute that Collins was in *Miranda* custody. *See, e.g.,* doc. 251 at 5, 7. There is also no plausible dispute that *Miranda* warnings were not provided, prior to the disputed colloquy.[1] The issue, then, is whether the statements were made in response to "interrogation," and, if so, whether some *Miranda* exception applies.

The Government first argues that Collins' statements were spontaneous utterances. *See* doc. 318 at 5-6. While it acknowledges that Saxon did ask the question Collins argues constitutes "interrogation," *see*

---

[1] The Government submitted a written acknowledgement and waiver of *Miranda* rights, signed by Collins. *See, e.g.,* doc. 251-3. That waiver was signed once Collins was transported to the Bulloch County Sheriff's Office for a formal interrogation. Since neither Collins' original nor supplemental motions seek to suppress statements he made during that formal interview, the waiver is not relevant to the instant dispute.

*id.* at 6, it argues that the question was merely seeking to "clarify" Collin's spontaneous "vague statements." *Id.* The Government's original brief, doc. 251 at 6, cites to this Court's recognition that "when a criminal suspect makes a voluntary statement that is ambiguous, police officers may ask clarifying questions without running afoul of *Miranda* so long as the questions do not appear to be intended to elicit an incriminating response." *United States v. McRae*, 2020 WL 1891749, at *5 (S.D. Ga. Jan. 23, 2020). That citation is apposite, although not for the reason the Government intended. Even assuming that the Government is correct that Collins' initial statements concerning his offers of cooperation were vague or ambiguous,[2] as Judge Epps explained after the quoted sentence

---

[2] The Court's review of the body-worn-camera video confirms that Saxon's question about whether there is "anything here" does not seek "clarification" of any prior vague or ambiguous statement by Collins. The Government is correct that some of the things that Collins says, albeit clearly in the context of discussing his potential cooperation in identifying other individuals, are vague and ambiguous. However, Collins is correct that Saxon's question represents a "chang[e in] the conversation from whether Mr. Collins would make a phone call and arrange for a controlled buy of drugs to whether there were drugs currently in his possession . . . " Doc. 307 at 5. The Government's vague "disagreement" with Defendant's summary of the video's contents, *see* doc. 318 at 6 n. 2, and generalized description of the entire interaction as a "back and forth discussion" is simply not sufficient to identify a vague or ambiguous statement justifying the application of the *Miranda* exception. Moreover, the Government points to no authority, and the Court is not aware of any, that would expand the clarifying-question exception to encompass any "natural evolution" of a conversation, even one voluntarily initiated by a suspect. *See id.* at 7. *Miranda* clearly permits officers to listen when a suspect voluntarily speaks, but if they want

from *McRae*, "[f]ollow-up questions concerning whether Defendant possessed [contraband] and where [it] was located . . . [are] not neutral responses, intended to clarify Defendant's puzzling declaration." *McRae*, 2020 WL 1891749, at *5 (quoting *Anderson v. Thieret*, 903 F.2d 526, 532 (7th Cir. 1990)) (internal quotation marks and alterations omitted); *see also*, 2 Wayne R. LaFave, Jerold H. Israel, *et al.* Crim. Proc. § 6.7(d) (4th ed. Nov. 2024) ("a [clarifying] question which would enhance the defendant's guilt or raise the offense to a higher degree" would constitute *Miranda* interrogation). The "clarifying questions" exception, therefore, does not apply. It is also clear that asking about whether contraband is present is a question "that the police should know is reasonably likely to elicit an incriminating response" from the suspect. *Innis*, 446 U.S. at 301.

The Government next argues that Collins' statements in response to Saxon's question are admissible under the "public safety" exception to *Miranda. See, e.g.,* doc. 318 at 7-9. The Government argues that, because Saxon's question about whether there was "anything here," occurred "*after* Defendant made assertions that he could provide [officers] with

---

to steer the conversation to prompt a suspect to disclose potentially incriminating information, its protections equally clearly apply.

Fentanyl[, their] inquiries were directly related to the current perceived risk, the location of the illegal narcotics." Doc. 318 at 8. Defendant argues that the authority in this Circuit establishing the limits of the public safety exception does not support the Government's assertion. *See* doc. 307 at 7-9. Defendant is correct.

The Supreme Court has recognized that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *New York v. Quarles*, 467 U.S. 649, 657 (1984). *Quarles* describes the exception it recognizes as "narrow," and "circumscribed by the exigency which justifies it." *Id.* at 658. *Quarles* was also clear that the application of the exception "should not be made to depend on post hoc findings at a suppression hearing concerning the subjective motivation of the arresting officers." *Id.* at 656. The Eleventh Circuit has recognized the public safety exception's application where officers ask questions, often involving the location of firearms, explosives, or hidden suspects, in "very rapid sequence[s] of events." *See United States v. Spoerke*, 568 F.3d 1236, 1249 (11th Cir. 2009) ("The threat posed by two pipe bombs in a vehicle on a city street" justified application of the

public interest exception); *United States v. Newsome*, 475 F.3d 1221, 1224-25 (11th Cir. 2007); *see also United States v. Ochoa*, 941 F.3d 1074, 1097-98 (11th Cir. 2019) (applying the public interest exception where officer "knew he was dealing with a potentially violent suspect who was in possible possession of a firearm," along with "his concern that other individuals might have remained," in the location); *United States v. Jones*, 798 F. App'x 434, 440-41 (11th Cir. 2020); *United States v. Freeman*, 591 F. App'x 855, 861-62 (11th Cir. 2014); *United States v. Smith*, 322 F. App'x 876, 878 (11th Cir. 2009) (question, at the scene of a car accident, "about weapons" was permissible "based on [Defendant's] agitation and his strong odor of alcohol.").

The Government acknowledges that there is no authority in this Circuit for applying the public safety exception "to drug paraphernalia." Doc. 318 at 7-8. The Court has identified one case in which the Court of Appeals sanctioned the application of the public safety exception to the identity of apparent narcotics. In *United States v. Aponte*, the court considered whether an officer's question about the identity of a "gray substance" discovered during the consensual search of a vehicle violated *Miranda*. 662 F. App'x 780, 787 (11th Cir. 2016). The Court's analysis

10

of the issue is, however, extremely limited. *See id.* The Government points to the United States District Court for the Middle District of Florida's opinion in *United States v. Scott* as persuasive authority. *See* doc. 318 at 7-8. However, *Scott*, like *Aponte*, expressly noted that the question about the substance's identity was justified, in part, by "*the presence* of a substance consistent with narcotics." 2024 WL 4709950, at *6 (M.D. Fla. Aug. 5, 2024) (emphasis added).[3] Cases from outside this Circuit are analogous. *See, e.g., United States v. Elder*, 2017 WL 8819909, at *2, *4 (W.D.N.Y. Oct. 31, 2017) (applying the public safety exception "[a]fter substances were located," based on specific information that suspect possessed fentanyl), *adopted in relevant part by United States v. Elder*, 2018 WL 833132, at *4 (W.D.N.Y. Feb. 13, 2018). Those cases are clearly distinguishable, as, here, the officers were not confronted by an unidentified substance, they were attempting to discover one.

---

[3] The other case the Government cites, *United States v. Simpkins*, is even less persuasive. *See* doc. 318 at 8. *Simpkins* involved an officer's question, "[d]uring [a] pat-down, . . . if [the defendant] had anything on him." 978 F.3d at 1, 10 (2020). The fact that the defendant in *Simpkins* disclosed that he possessed fentanyl in response to the question does absolutely nothing to suggest that the public interest exception permits officers to ask generalized questions about contraband in the absence of any exigent circumstances.

The Government points to no authority from any court suggesting that a question about the presence of narcotics, as opposed to weapons or potential assailants, in the vicinity of a suspect and unmotivated by any exigency is covered by the public safety exception. *See generally* doc. 318 at 8-9. The authority the Court has discovered is overwhelming in rejecting any such assertion. The United States District Court for the District of South Carolina has persuasively rejected application of the public safety exception in the context of the execution of a search warrant for fentanyl. *See United States v. White*, 733 F. Supp. 3d 491, 493 (D.S.C. 2024). As *White* succinctly explains, where "officers were safely separated from the potential drugs, and could easily wait for safety measures," suspicion of, or even probable cause to believe in, the presence of fentanyl "fails to an emergency make." *Id.* at 493-94. Moreover, this Court has declined to apply the public safety exception to officers' questions about narcotics possession. *See McRae*, 2020 WL 1891749, at *6 ("[A]sking whether Defendant had cocaine on his person[ ] falls outside the public safety exception because there is no danger posed to arresting officers of the public by a suspect's possession of controlled substances on his person."). Finally, a magistrate judge in the Northern

District of Alabama recommended acceptance of a strikingly similar argument to the one the Government advances here.[4] *See, United States v. West*, 2018 WL 6596458, at *14 (N.D. Ala. Apr. 17, 2018) ("Given [the officer's] concerns about fentanyl, [Defendant's] incriminating responses to [the officer's] questions fall within *Quarles*'s public-policy exception to *Miranda*."). The district judge disagreed because "[t]here was no emergency that required the officers to forego *Miranda* warnings to ensure officer safety." *United States v. West*, 2018 WL 6191082, at *7 (N.D. Ala. Nov. 28, 2018), *vacated on other grounds by United States v. West*, 806 F. App'x 892 (11th Cir. 2020). Other cases involving the public safety exception also rely on additional exigent circumstances beyond those posed by the narcotics themselves. *See United States v. McKenzie*, 2022 WL 16958658, at *5 (W.D. Pa. Nov. 16, 2022) ("The revelation that the safe contained fentanyl created an exigency to the safety of the officers who were in the process of 'ramming' it open." (citation omitted)); *United States v. Morse*, 2022 WL 5007909, at *2 (N.D. Cal. Oct. 4, 2022)

---

[4] The facts in *West* are, arguably, stronger in support of the application of the public safety exception than the instant facts. In *West*, the Report and Recommendation explained that officers were directly confronted with potentially fentanyl-laced heroin. *See* 2018 WL 6596458, at *14-*15.

(recognizing that concerns "about exposure to fentanyl is certainly reasonable," but did not support application of the exception, where question concerned drugs located outside the officer's immediate vicinity); *see also United States v. Ahrendt*, 2024 WL 124681, at *14-*15 (D.S.D. Jan. 11, 2024) (recognizing that access to "intoxicating substance" implicated public safety exception, but declining to apply it "once [Defendant] is arrested, handcuffed, and placed in the back of the vehicle, [he] no longer had access to . . . marijuana, and thus an officer's questioning about [Defendant's] marijuana was no longer reasonably prompted out of a concern for public safety.")

Recognizing that no binding authority forecloses the Government's argument, the Court should find that the public safety exception does not apply to Saxon's question under these circumstances. Without diminishing the significant danger that fentanyl poses, Saxon and the other officers were not directly confronted with any substance that might have contained fentanyl, such that they needed to immediately determine whether the substance posed a threat to their safety. Rather, it appears, as the court found in *White*, that "the officers were safely separated from [any] potential drugs, and could easily wait for safety

14

measures," to assuage any possible concern. 733 F. Supp. 3d at 494. To extend *Quarles*' exception, as interpreted by the Eleventh Circuit, would appear to read out of it the requirement that it be "narrow," circumscribed by "exigency," arising out of "very rapid sequences of events." The Court should decline to expand the exception as the Government's argument requires.

In summary, the parties agree that Collins was in *Miranda* custody during the interview at the motel and was not provided *Miranda* warnings. The Court should find that Saxon's questions about whether there was "anything" in the room constituted "interrogation," within the meaning of *Miranda*. Finally, the Court should find that the Government's arguments that those questions were either "clarifying questions," not implicating *Miranda*, or justified by the public safety exception fail to bear its burden to justify the admission of the unmirandized statements. Accordingly, Defendant's Motion to Suppress, as clarified, should be **GRANTED**. Docs. 223 & 307. The statements identified in Defendant's Supplemental Motion, doc. 307 at 5, should be **SUPPRESSED**.

**B. Search (Doc. 224)**

Defendant also argues that evidence seized from the motel room where he was arrested should be suppressed. *See generally* doc. 224. He argues, first, that the warrant issued to search the room for his person does not support the subsequent search of the room for evidence. *Id.* at 6. He also argues that any consent he provided for the search was coerced. *Id.* The Government's response argues that Defendant lacks Fourth Amendment standing to challenge the search of the room. *See* doc. 251 at 4-5. It also argues, in the alternative, that Defendant consented to the search. *Id.* at 10-13. Finally, the Government argues that, even assuming that Defendant's consent was not effective, the evidence is admissible under the inevitable discovery doctrine. *See id.* at 13-14. Although Defendant's supplemental Motion does not discuss the search—which is understandable given the Court's instructions at the hearing—the Government's response provides additional argument that Defendant has not shown standing, *see* doc. 318 at 2-5, voluntarily consented to the search, *id.* at 9-10, and that the evidence would have been inevitably discovered, *id.* at 10. Because, as discussed below, the Court agrees with the Government that Defendant has not established

his Fourth Amendment standing to challenge the search, it does not

reach either of the Government's alternative arguments.[5]

  "In order to have evidence suppressed based on a violation of the

Fourth Amendment, a claimant has the burden of proving . . . that the

---

[5] While the Court does not reach the Government's consent or inevitable-discovery arguments, some brief observations on those arguments is appropriate.

  The Government asserts that Defendant's alternative argument that either he did not consent to the search or, if he did, the consent was involuntary are improperly "contradictory." Doc. 251 at 3-4. Alternative arguments frequently rely on "contradictory" premises. Moreover, the Government's aspersion ignores the fact that its own standing and consent arguments are, arguably, similarly "contradictory." As the Supreme Court has recognized, consent is only a valid exception to the Fourth Amendment's warrant requirement if the consenting party has authority over the premises to be searched, or one "whom the police reasonably, but erroneously, believe to possess shared authority as an occupant." *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (citations omitted). Thus, the Government's consent argument necessarily entails the assertion that Collins had, or officers reasonably believed he had, authority to consent to the search of the room. The Government's evidence, however, makes clear that officers knew before they entered the room that Collins was, at most, "*staying* there." Doc. 251 at 1 (emphasis in original). Testimony at the hearing indicated that, prior to entering the room and arresting Collins, officers had spoken to the "clerk" of the motel and their testimony implied that the clerk informed them that Collins was there, but did not inform them that Collins was the lawful occupant of the room. Moreover, the Government's argument concerning consent does not address, much less establish, any basis for the reasonableness of the officers' belief that Collins had such authority. *See* doc. 251 at 10-13. Given that the Government bears the burden to establish the effectiveness of consent, as an exception to the warrant requirement, the absence of any showing of any fact supporting a reasonable belief that Collins had such authority would seem detrimental, to say the least, to that argument. *See, e.g., United States v. Jackson*, 149 F. Supp. 3d 1366, 1371 (N.D. Ga. 2016) ("The Government has not carried its burden to show that the search was conducted pursuant to lawful consent by one reasonably believed to have authority to give it, as required in these circumstances to render the search reasonable under the Fourth Amendment.").

  The inevitable-discovery argument fares even worse. The Government's inevitable-discovery argument asserts that the contraband at issue would have been inevitably discovered, not by law enforcement, but by hotel staff. *See* doc. 251 at 14.

claimant had a legitimate expectation of privacy." *United States v. McKennon*, 814 F.2d 1539, 1542 (11th Cir. 1987) (citing *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980)). To make the required showing, the individual must demonstrate a "subjective expectation of privacy in the object of the challenged search," and that "society [is] willing to recognize that expectation as legitimate." *Id.* at 1542-43. "[A]n individual's Fourth Amendment rights are *not* infringed—or even implicated—by a search of a thing or place in which he has no reasonable expectation of privacy."

---

The Government asserts inevitable discovery because after being notified that officers had destroyed the door to the room, hotel staff "needed to—and had the authority to—enter the room, clean the room, and in this case, block off access to the room until a replacement door could be installed. In doing so, *hotel staff* would have certainly located the 200+ grams of Fentanyl, Defendant's cellular devices, and other items in the hotel room *which would have been provided to law enforcement for safekeeping*." Doc. 251 at 14. The Government's cursory presentation of the principle of inevitable discovery does not provide any support for the proposition that it applies based on the assumption that private third-parties will discover evidence and subsequently turn it over to law enforcement. *See id.* at 13-14. While the Court is aware of authority that such attenuated theories of inevitable discovery are not *per se* precluded, they require some basis, beyond plausible speculation, that the evidence would be discovered. *See, e.g., United States v. Stokes*, 733 F.3d 438, 446-48 (2d Cir. 2013); *see also, e.g., United States v. Cooper*, 24 F.4th 1086, 1094 (6th Cir. 2022) ("The risk of intolerable speculation [in analyzing inevitable discovery] increases, however, when the government's theory of discovery relies on the irregular actions of third parties." (citing *Stokes*, 733 F.3d at 447); *United States v. Owens*, 782 F.2d 146, 153 (10th Cir. 1986) ("The evidence certainly does not demonstrate that the Inn's staff would necessarily have recognized the powder as cocaine or have called the police if they had so recognized it," and finding assertion of inevitable discovery excessively speculative). Even if the Court overlooked the lack of legal authority in the Government's brief, it could not overlook the lack of any supporting evidence in the record.

*United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020).   The

defendant challenging the evidence bears the burden of showing that he

has "standing."  *See, e.g., United States v. Padilla*, 508 U.S. 77, 81 (1993)

("It has long been the rule that a defendant can urge the suppression of

evidence obtained in violation of the Fourth Amendment only if that

defendant demonstrates that *his* Fourth Amendment rights were

violated by the challenged search or seizure.").

Before discussing the substance of the standing argument, the

Court must address what appears to be confusion concerning the status

of those arguments.  At the hearing, counsel for the Government sought

to preclude further proceedings, arguing that Defendant had a

"threshold" obligation to establish his standing before the Government

could be required to present any evidence.  As discussed below, the

Government's position misunderstands the significance of the concept of

Fourth Amendment "standing."   At the hearing, the Court made a

preliminary determination that "there is a *threshold showing* of Fourth

Amendment standing . . . *for purposes of Defendant's ability to seek

suppression*," and proceeded to take evidence.   The Court's

determination, therefore, was limited to a rejection of the Government's

attempt to preclude presentation of evidence.  It was not—nor could it have been prior to the presentation of the evidence—a final determination that Defendant had borne his burden to establish his standing.

Courts have come to refer to a party's required Fourth Amendment interest in the subject of a search as "Fourth Amendment standing." *See, e.g., Byrd v. United States*, 584 U.S. 395, 410-11 (2018).  As the Supreme Court has explained, "[t]he concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search . . . ."  *Id.* at 410.  However, it has cautioned that the concept "should not be confused with Article III standing, which is jurisdictional and must be addressed before reaching the merits" of a dispute.  *Id.* at 410-11 (citation omitted).  "Because Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim."  *Id.* at 411.  The Court, therefore, declined the Government's request to dispose of the issue of Defendant's Fourth

Amendment standing independently of the merits of his other challenges to the search. However, the Court must still determine whether Defendant has borne his burden to establish his Fourth Amendment standing. For the reasons explained below, he has not.

As the Government points out, doc. 318 at 2, the United States District Court for the Northern District of Georgia has required the non-registered occupant of a hotel room to "show an unrestricted right of occupancy or custody and control of the premises as distinguished from occasional presence on the premises as a mere guest or invitee." *United States v. Bushay*, 859 F. Supp. 2d 1335, 1350 (N.D. Ga. 2012) (quoting *United States v. Baron-Mantilla*, 743 F.2d 868, 870 (11th Cir. 1984)) (internal quotation marks omitted). *Baron-Montilla*, however, did not involve the occupant of a hotel room, but the occupant of an apartment. *See* 743 F.2d at 870. In *United States v. Cooper*, the Eleventh Circuit noted that whether "the overnight guests of hotel registrants, especially those guests not disclosed to the hotel" possess any expectation of privacy in the hotel rooms, "is an open question in this circuit." *United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000). Although *Cooper* declined to resolve the question, the court noted that occupation "for a strictly

commercial purpose," such as "using the hotel room predominantly to engage in narcotics trafficking," would likely deprive occupants of any expectation of privacy, "even if they had been the overnight guests of the [registrant]." *Id.* at 1285 n. 3. Although the case law in this Circuit is not well-established, it is clear from both *Cooper* and *Bushay* that an individual's mere presence in a hotel room, even overnight, is not alone sufficient to establish his Fourth Amendment standing.

At the hearing, Defendant's argument relied exclusively on his presence. His counsel pointed to evidence that the motel clerk identified Collins as the occupant of the relevant room, the fact that Collins was "sleeping," or at least unclothed and laying in the bed, and had possessions in the room as supporting his Fourth Amendment standing. His brief, and his argument at the hearing, pointed only to *United States v. Mercer* in support of his reasonable expectation of privacy and standing. *See* doc. 224 at 3. *Mercer*, however, stands for the indisputable proposition that a registered guest in a hotel or motel has a reasonable expectation of privacy. *See* 541 F.3d 1070, 1072, 1075 (11th Cir. 2008) (noting that the hotel reported to law enforcement "that Defendant had rented a room for the night," and acknowledging "[t]he Fourth

Amendment protects a person's reasonable expectation of privacy in *his* motel room." (emphasis added)). *Mercer*, therefore, does not provide any support for the privacy interests of itinerant hotel occupants. Moreover, Defendant points to no authority contrary to the persuasive authority discussed above that itinerant guests of hotel or motel registrants do not have automatic Fourth Amendment standing in the rooms they might occupy. Given that Collins bears the burden to establish his Fourth Amendment standing, the relative lack of evidence or relevant legal authority is fatal to his Motion.

Although the Court concludes that Collins lacks Fourth Amendment standing to challenge the search of the motel room, because it finds that his statements should be suppressed, and he argues, if only cursorily, that the search of the room is "fruit of the poisonous tree," it must address that argument. First the Court notes that Collins' original Motion barely suggests a "fruit of the poisonous tree" argument. *See* doc. 224 at 6-7. His Supplemental Motion is not much more explicit.[6] *See* doc.

---

[6] Given the Court's instructions that the scope of the supplemental briefing was to be limited to the identification of the statements Collins contended he made in violation of *Miranda*, the Court is not convinced that the fruit of the poisonous tree argument is even properly before it. Whether it is or not, however, it is, as discussed below, insufficient.

307 at 1, 9.  The strongest assertion in either Motion is his assertion, "to the extent that the search of the room . . . was the product of a prior constitutional violation—such as an illegal interrogation, and therefore fruit of the poisonous tree—the evidence seized . . . should be suppressed. *Id.* at 3 (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)). The Government's responses do not directly address the argument at all. *See generally* docs. 251 & 318.

Notwithstanding the procedural and substantive deficiencies of Defendant's presentation, and the Government's failure to address the issue at all, the arguments are straightforwardly resolved.  The Supreme Court has held that "[b]ecause the *Miranda* rule protects against violations of the Self-Incrimination Clause, which, in turn, is not implicated by the introduction at trial of physical evidence resulting from voluntary statements," the "physical fruits" of the statements are not suppressible.  *United States v. Patane*, 542 U.S. 630, 634 (2004).  As the United States Court of Appeals for the Sixth Circuit has succinctly summarized: "[A] failure to provide a *Miranda* warning, standing alone, cannot justify the exclusion of physical evidence found because of the unwarned statements."  *United States v. Burton*, 828 F. App'x 290, 292-

93 (6th Cir. 2020); *see also United States v. Morgan*, 143 F.4th 1264, 1275 (11th Cir. 2025) (discussing the concurrences in *Patane* and concluding, "[f]ive Justices thus concluded that a violation of *Miranda*'s prophylactic rule does not necessarily require the suppression of physical evidence derived from a suspect's unwarned-but-uncoereced statement. (citing *United States v. Jackson*, 506 F.3d 1358, 1361 (11th Cir. 2007)). Although Collins does not concede that his unmirandized statements were uncoerced, there is no indication in the record of coercion. *See, e.g., Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' . . . ."). Since "*Miranda* does not require the exclusion of physical evidence that is discovered on the basis of a voluntary, although unwarned, statement," Defendant's fruit-of-the-poisonous-tree argument to suppress the fruits of the search must fail.

The Court should conclude that Collins has not borne his burden to establish his Fourth Amendment standing to challenge the search of the motel room and, to the extent that he adequately raised it, his fruit-of-the-poisonous-tree argument is precluded by *Patane* and its progeny. His

Motion to Suppress evidence discovered in the search of that room should, therefore, be **DENIED**.  Doc. 224.

In summary, Collins' Motion to Suppress his statements, as supplemented, should be **GRANTED**.  Docs. 223 & 307.  His Motion to Suppress the fruits of the search of the motel room where he was arrested should be **DENIED**.  Doc. 224.  This Report and Recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3.  Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties.  The document should be captioned "Objections to Magistrate Judge's Report and Recommendations."

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge.  The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to timely file objections will result in the waiver of rights on appeal.  11th Cir. R. 3-1; *see Symonette v. V.A. Leasing Corp.*,

648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED,** this <u>14th</u> day of August, 2025.

_____
CHRISTOPHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

27